Filed 6/25/14  In re S.H. CA2/8

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re S.H., Person Coming Under the Juvenile Court Law. | B253796 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.H.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK65682) |

APPEAL from the orders of the Superior Court of Los Angeles County.  Julie F. Blackshaw, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * * *

Mother A.H. appeals from the juvenile court's jurisdictional findings under section 300, subdivisions (a) and (b) of the Welfare and Institutions Code,[1] concerning her son, S.H. Father M.H. is not a party to this appeal. Mother contends the dependency court's conclusion that S.H. was at risk under section 300, subdivisions (a) and (b), is not supported by substantial evidence, because father was able to care for and protect S.H., and therefore family court was the proper forum to resolve the family's problems. Mother also contends that even if there was evidence S.H. was at harm at the time the family came to the attention of the Los Angeles County Department of Children and Family Services (Department), the harm had been neutralized by the time the jurisdictional hearing was held, and any risk of future harm was speculative. We find substantial evidence supports the jurisdictional findings, and therefore affirm.

## BACKGROUND

The family came to the attention of the Department on May 26, 2013, after the Department received a referral for emotional and physical abuse of then one- and a-half year-old S.H. When S.H. was taken to the hospital for an accidental burn, mother became so explosive during S.H.'s examination that she was forcefully medicated and placed on an involuntary psychiatric hold.

### 1.    The Department's Investigation

Social workers Tasha Beard and Adrian Hawkins summarized their findings in the detention report. On May 26, 2013, the Department investigated a referral that S.H. had been burned by spilled coffee, and that mother was trying to leave the hospital before S.H. had been treated. According to the reporting party, father placed his coffee cup on top of a towel on the kitchen counter. S.H. was burned when he pulled on the towel, spilling the coffee. At the hospital, mother "had the child in a blanket like a rag doll." She did not want S.H. to be examined, and wanted to leave the hospital before S.H. had been treated. She accused the physician of being a "child molester" when he attempted to

_____

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

examine S.H.'s penis, which was close to the site of the burn. Mother became so combative that she had to be sedated. According to the physician, father "was the only rational person he could talk to about the incident."

A Department social worker and police detectives went to the family home to investigate the cause of S.H.'s burn. They ultimately determined the burn was accidental, and S.H. was not immediately removed from mother and father.

On June 5, 2013, a Department social worker visited the family, and spoke with mother. Mother was hostile, and refused to allow the social worker to see S.H. because S.H. was sleeping.

On June 6, 2013, a Department social worker interviewed paternal aunt, who often cared for S.H. Paternal aunt reported that mother smokes marijuana, and "can get angry very quickly for no reason." Mother also hits father. Mother recently punched father in the eye while father was holding S.H., and father required medical treatment for his injuries. Paternal aunt did not think mother abused S.H., however.

Mother rarely cares for S.H. A nanny looks after him Monday through Friday, from 9:00 a.m. to 5:00 p.m. while father works. Father is S.H.'s primary caregiver, even though mother does not work. Father gets up with S.H. every morning, feeds him, and changes his diaper, while mother is sleeping. Father is a licensed psychologist and "will do anything to keep the child safe." According to paternal aunt, father (who is significantly older than mother) has contemplated calling the elder abuse hotline to report mother. At the time of the detention report, mother was 24 years old and father was 66 years old.

On June 11, father left a voicemail message for a Department social worker, stating that "mother is very violent and abusive toward him." Mother breaks things in the home while S.H. is present. She also physically abuses father and punches him when she is upset or when he tells her "no." Father allows mother to abuse him daily "for the well-being of his son." However, father said he was no longer willing to put his son in jeopardy and he wanted the Department's help.

3

On June 12, a Department social worker spoke with father by phone, and father said he was available to meet with the Department in his home on June 14. Father was very fearful of mother, and was scared what mother would do after the meeting with the Department. Mother had threatened to kill father in his sleep, and threatened his life when she did not get her way or father did not give her money. Several months earlier, mother hit father in his face while father was holding S.H. The blow to his eye caused a blood vessel to burst, which required medical attention. Mother also yells at S.H. and tells S.H. to "shut the f--- up" when he cries.

According to father, mother smokes marijuana around S.H. On June 11, mother was high and dropped S.H. Father believed mother was too high to catch S.H. from falling. Mother also drinks alcohol and drives while intoxicated. Father believes that mother suffers from bipolar disorder. Father wanted mother out of the family home.

Father's friend and handyman, Joseph Galvin, told the Department that he had never seen mother hit father, but he heard her call him "stupid" and an "idiot" in S.H.'s presence. Once, while S.H. was crying in his highchair, mother yelled at S.H., telling him to "shut up" and "can you just f------ shut up." Another time, mother yelled at S.H. when he was crying because mother would not allow him to play with a toy. Mother yelled for S.H. to "stop," "shut up," and then screamed "I can't make him stop, make him stop." According to Mr. Galvin, mother often yelled at S.H. Even though father employed a nanny to care for S.H., "at times the child is left alone with mother." However, most of the time, father took S.H. with him when he had to leave the home. Father was S.H.'s primary caregiver because of mother's behavior.

Department social workers visited the family home on June 14. Mother and father were interviewed separately. When the allegations were explained to mother, mother said she lost her temper at the hospital because S.H. had just fallen asleep when the physician went to examine him. Mother admitted she called the physician a pedophile, child molester, and a rapist. Mother was upset because she wanted to take S.H. to another hospital due to how long they were forced to wait to have S.H. treated. Mother believed her reaction was normal.

4

Mother denied any domestic violence between her and father. Mother denied that she punched father in the eye, causing a blood vessel to burst. She claimed father's injury was caused when S.H. hit father with a toy. Mother then became extremely upset, with no warning, and stormed into the room where father was being interviewed. She yelled at father, asking whether he told the Department that she "caused that bruise on your f------ eye?" Father responded, "'you did.'" Mother could not control her temper when her interview resumed in the other room. When asked about her mental health and sexual abuse history, mother reported that "she was raped several times by random people and most recently on a trip she took to Mexico alone to de-stress without the baby." She admitted suffering from mental health problems. Mother claimed to attend weekly counseling to address her past and her anger issues. However, mother would not sign a release form to allow the Department to communicate with her mental health providers. Mother had no concerns about father, and reported that he is the "calm one" in the relationship.

During father's interview, father reported that mother was uncontrollable, and hit him when she did not get her way, even if he was holding S.H. She last hit father on June 13, after he refused to allow her to travel to Paris alone. Mother told him she had been raped while traveling in Mexico, but father was skeptical because mother did not make a police report. Mother punched father in the face when he said she needed to travel with someone else. Father denied hitting mother when she attacks him. Mother had attended counseling, but not since March. Father expressed fear that mother will kill him, as she has threatened his life before. He said that mother curses and yells at S.H. when he cries, and she "smokes pot" and "sleeps all day."

Mother, father, and the social workers then discussed a safety plan contract. The social workers explained that mother would need to leave the family home, but that S.H. could stay in the home with father. Mother initially refused to sign the contract, and yelled at father for 10 minutes, threatening to divorce father and take all of his money. She blamed father for the Department's involvement, stating that father's reports made her "look bad" and that father should have "lied" to keep the Department out of their

lives. Mother could not be calmed, and continued to cry, yell, scream, and blame father. Mother told the Department that father was arrested for domestic violence. She then admitted that father did not hit her, but she claimed to have a police report that says he did. Father explained that when mother was seven months pregnant, she was upset and started breaking things in the house. Father called police, and when they arrived the police said someone would need to go to jail. Father took the "rap," but the charges were later dropped. Mother eventually signed the safety contract, and the Department arranged for paternal aunt to monitor mother's visits with S.H. Father agreed to contact police if mother returned to the family home.

The Department spoke with the family's nanny, America. America confirmed that mother sleeps all day while America cares for S.H. Mother screams at S.H. when he cries. Mother would also yell, curse, and scream at father, while father remained calm. Mother would scream at father in S.H.'s presence. America has never seen mother hit S.H. On a normal day, father cared for S.H. until America's arrival, and father would take care of S.H. after he returned home from work. Mother rarely was alone with S.H. during the day.

On June 15, paternal aunt monitored a visit between mother and S.H. The visit went well, but mother threatened to take S.H. to Mexico, and said she "was going to poison the dogs because they bark too loud."

Father reported that mother broke into the family home on the evening of June 14. Father called police, and mother fled before police arrived. On June 16, mother sent father an email with a picture of a self-inflicted wound to her wrist that was dripping blood, with the message: "Happy Father's Day." On the morning of June 17, mother broke into the family home through an open window while father was at work. America contacted father and he called the police. Mother left before the police arrived. Mother then went to father's work and "caused a scene," shouting and cursing and demanding to speak with father. Mother refused to leave, and was escorted off the property by the Pasadena police. The police advised father to obtain a protective order. Father said he was in the process of doing so.

On June 19, father reported he obtained a protective order, protecting him and S.H. from mother.

The Department's detention report included a number of attachments, such as a 2011 letter from mother, recanting any allegation that father hit her (relating to his arrest); a series of text messages from mother advising that she would take all of father's money if he tried to divorce her or obtain a restraining order; and a copy of father's request for a domestic violence restraining order.

The Department filed a petition on June 25, 2013, alleging ongoing domestic violence between mother and father, that mother has mental and emotional problems and abuses marijuana and alcohol, and that father failed to protect S.H.

At the June 25 detention hearing, the trial court found a prima facie case to detain S.H., and released him to father. Mother was ordered to not reside in the family home, and her visitation with S.H. was to be monitored, but not by father. The court ordered the Department to provide domestic violence and individual counseling referrals to both parents, and random drug testing referrals for mother.

The Department continued its investigation, and summarized its findings in a July 23, 2013 jurisdiction and disposition report, portions of which we describe below.

Mother has a history with the department, as a dependent child. In 2000 and 2002, petitions were sustained for abuse and neglect, and there were many other referrals for abuse and neglect of mother in 1997, 1999, 2000, 2001, 2002, and 2004.

Mother resisted the Department's involvement with S.H. On June 20, 2013, mother sent an email to a Department social worker with the subject heading, "California Court Rules Medical Marijuana Is No Reason to Take A Child Away | The Weed Blog," with a link to the article. On June 28, the Department received a letter from a drug testing facility requesting that mother test elsewhere after mother "was demanding, with attitude, using profanity, disturbing our patients, banging on the windows screaming like crazy 'I need to pee.' She was also threatening us and accusing us of altering her test." Mother's test that day was positive for marijuana. On July 5, West Los Angeles Department staff reported to the assigned social worker that they were "having great

difficulty with mother . . . due to her lack of cooperation and refusal to follow instructions." Mother's behavior had resulted in the police being called.

During a July 8 interview with a Department investigator, mother reported that she used marijuana medicinally, to treat insomnia. She told the investigator that she has a medical marijuana card, but did not show it to the investigator. According to mother, it was father who recommended that mother use marijuana because she did not respond well to the psychotropic medicine that father's friend prescribed for her. This friend and business partner, a psychiatrist, prescribed Zoloft, Ativan, Ambien, and Ensam for mother, notwithstanding the fact that he never treated her. She reported that father likes it when she takes Ambien, as it makes her lethargic, and allows him to engage in bondage, dominance, sadism and masochism with her. She said father does not enjoy being intimate with her unless it involved inflicting pain on her. Father threatened her with divorce if she did not do as he wished. She believed the Department became involved because father was angry at her because she refused to augment her breasts and dye her hair blonde. Father is very controlling and has isolated mother from her friends. He does not respect women and sees them as "breeding machines." He only married her because he wanted a child.

Mother claimed father physically abused her in the past. He kicked her in the stomach when she was seven months pregnant because she would not agree to have S.H. circumcised. After father was arrested for this incident, he forced mother to sign a declaration denying the abuse. Mother denied being violent with father and insisted that father's eye was injured by S.H.'s toy.

Mother denied she had been diagnosed with bipolar disorder, or any other psychiatric disorder. She had consulted lawyers about the incident in the hospital, and they agreed that her reaction was "perfectly normal" and that she could sue for being involuntarily sedated. The email she sent to father was a joke. She had not cut herself; the "blood" was really ketchup.

Mother believed the nanny, America, had made false statements to the Department. Mother denied yelling at S.H.

8

In a June 23, 2013 email to a Department social worker, father provided additional details about mother.  On June 14, mother broke into the family home to take some clothes.  Father called the police, and mother left.  On June 17, mother again broke into the family home and took some clothes and $500 in cash.  Again, the police were called.  On June 20, father received a message from a proprietor at a bed and breakfast where mother had been staying.  Mother made threats to the proprietor about getting a gun and either killing herself or killing father.  Mother also told the proprietor that she was smoking methamphetamine.

On June 21, mother broke into the family home, even after father changed the gate code and locks.  She went directly to the drawer where father's gun was stored, but it was not there because father had already removed it.  Mother took some clothes and $622 from S.H.'s piggy bank.  Mother then grabbed S.H., ran out the front door, and climbed a five foot tall wall with S.H. in her arms.  She then sat in front of the house waiting for police, who served her with the restraining order.  America and paternal aunt witnessed this incident.

Father sent the Department another email on June 29, 2013, reporting that the day before, mother broke into paternal aunt's house and had to be removed by the police.  Mother kicked paternal aunt's dog, yelled at a child who was present in paternal aunt's home, and threatened paternal aunt's maid with a fork.

Father was interviewed by a Department investigator on July 11, 2013.  Father and mother met in 2010 through their mutual eyebrow stylist.  Mother told father she was accustomed to dating older men, and had dated men in their 70's.  Two weeks into their relationship, they went to Las Vegas.  Mother wanted to get married.  When father would not agree to get married, mother got very angry and threw his mobile phone out the car window, and kicked him.  They were stopped by police, and mother calmed down and apologized.  After that incident, their relationship "thrived."  Mother moved in with father after five months.

On Valentine's Day in 2011, mother and father got into a verbal fight, and mother lunged at father, grabbed his throat, and threatened to kill him.  Mother had to be

9

restrained by her brother, who was visiting at the time. Mother again assaulted father in March 2011, and father made a police report. Shortly thereafter, father learned mother was pregnant, and he married her two weeks later "to ensure that mother . . . and [S.H.] were taken care of financially in the event that something happened to him." Father reported that their relationship "thrived" during the pregnancy. He told the Department investigator, "I want the woman I fell in love with back, I want [her] to get help so she can be that woman again." According to father, mother was stable during her pregnancy and for the first three months after S.H.'s birth. She started to change in December 2011,[2] yelling and screaming at father for hours at a time. In January 2012, mother took S.H. to Palm Springs alone. She started to talk about S.H. as not being her baby; "he is yours, he looks just like you. I was just a surrogate."

Marijuana is mother's drug of choice. Father discovered that she continued to smoke it while she was pregnant with S.H., and while she was breastfeeding him. She had smoked marijuana since she was 12 years old.

In the last six months, mother's violent behavior had escalated significantly.

On July 9, 2013, mother kicked and broke the living room window of the family home. She was placed in a police patrol car, and broke two of the car's window's with her head. When the officers announced they were taking her to jail, she told them she had taken 100 pills. After she was medically cleared, she was taken to jail.

Before mother met father, she had engaged in acts of prostitution. Since the Department's involvement with the family, mother admitted to father that she was again prostituting herself. Father found an envelope in mother's car containing $6,000 in cash, detailing the sexual services she had performed to make the money. Father was concerned for her safety, and became tearful during his interview.

Mother told the Department investigator that father is a good father, and that he brings stability to S.H.'s life. Mother believes that she is a good parent as well, and that

---

[2]     The report states December 2012, but this appears to be a typographical error.

10

she brings "fun and affection" into S.H.'s life. She does not believe her visitation with S.H. should be monitored, and she feels that S.H. should be allowed to live with her.

The Department investigator concluded that S.H. was at a "very high risk" for future abuse based on mother's violent and impulsive behavior, and father's "inability to set and enforce proper limits and boundaries" with mother. Specifically, the Department investigator was concerned that father failed to take active steps to limit mother's access to S.H., and that he continued to reach out to mother, and romanticized their relationship, even though it was fraught with violence from the very beginning.

Mother continued to deteriorate. On July 15, 2013, mother texted father that she was going to kill herself, and had taken "a bunch of drugstore Pills." On July 19, 2013, mother emailed a Department social worker: "I refuse to waste my precious life on all the numerous classes and programs you are requesting I do for the sake of my son[.] I love my son dearly and I am showing that by moving away and taking care of myself independently. [¶] . . . As all this stress can have damaging effects on ones [*sic*] body and I refuse to let 'dcfs' or my ex husband destroy what young and promising life I have. I [*sic*] much rather live in another state and get my life back to balance and harmony then [*sic*] to submit to anything a agency like dcfs recommeneds [*sic*] I do based solely on allegations of lies. [¶] So once again how would I give full custody to my husband without terminating my rights?"

In a November 6, 2013 last minute information for the court, the Department indicated that father had become "hostile" and "uncooperative," and had not returned the Department's phone calls. After the Department contacted him by email, father responded and denied he had ever received any phone calls. Father requested "written documentation informing [him] of exactly what [the Department's] expectations [are]." Father also indicated that he had made a complaint against one of the social worker's assigned to his case, and that he had "been subjected to a great amount of un-needed stress" by the Department. When a Department social worker responded that home visits by the Department are court ordered, and that messages were left on the phone number provided by father, father responded "by law I can refuse entry according to my attorney

11

and am perfectly legal and advised to do so.  So please don't make this difficult for you[.] I asked you for documentation and I will gladly bring [S.H.] to your office but I will not tolerate any home visits at the moment[.]  [I]t's too disruptive and . . . too traumatic . . . ." When threatened with a removal warrant for S.H., father agreed to a scheduled home visit with the Department.

The last minute information for the court also indicated that the Department had not received any information concerning mother's case plan compliance, or the quality and quantity of her visits with S.H.

### 2. The Adjudication and Disposition Hearing

At the November 6, 2013 adjudication and disposition hearing, the trial court received the Department's reports and their attachments into evidence.

After considering the evidence, the trial court sustained the following allegations under section 300, subdivisions (a) and (b):

"[Counts a-1, b-1]  [¶]  The child [S.H.'s] mother . . . and father . . . have a history of engaging in violent altercations in the child's presence . . . .  The father failed to protect the child in that the father allowed the mother to reside in the child's home and have unlimited access to the child.  Such violent conduct on the part of the mother against the father, and the father's failure to protect the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and failure to protect.

"[Count b-2]  [¶]  The child [S.H.'s] mother . . . has mental and emotional problems, and suicidal ideation and self-mutilation, which renders the mother unable to provide regular care and supervision of the child. . . .  The mother has failed to regularly attend the mother's counseling program.  Such mental and emotional condition on the part of the mother endangers the child's physical health and safety and places the child at risk of physical harm and damage.

"[Count b-3]  [¶]  The child [S.H.'s] mother . . . has a history of illicit drug abuse and is a current abuser of marijuana and alcohol, which renders the mother incapable of providing regular care of the child. . . .  The child's father . . . failed

12

to protect the child in that father knew of mother's illicit drug and alcohol abuse, and allowed the mother to reside in the child's home and have unlimited access to the child. The mother's substance abuse and the father's failure to protect the child endangers the child's physical health and safety and creates a detrimental home environment for the child, placing the child at risk of physical harm, damage and failure to protect."

As to disposition, the court clarified that father was to allow the Department to have unannounced visits. The court ordered S.H. to be removed from mother, and released to father. Mother's visitation with S.H. was to remain monitored, and those visits were not to be monitored by father. Father was ordered to participate in individual counseling. Mother was ordered to participate in counseling, random drug and alcohol testing, and parenting classes.

This timely appeal followed.

## DISCUSSION

Mother contends there is insufficient evidence to support the trial court's jurisdictional findings under section 300, subdivisions (a) and (b). Specifically, mother contends there is no substantial evidence that S.H. was at risk of harm because father adequately protected S.H. from mother by obtaining a restraining order, calling the police, and by employing a nanny and acting as S.H.'s primary caregiver. Mother maintains the petition should have been dismissed with exit orders for the family law court. We disagree, and find the evidence amply supports the trial court's exercise of jurisdiction in this case.

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] . . . [Citation.] The

13

appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

We will affirm the jurisdictional order if *any* of the grounds cited by the dependency court is supported by substantial evidence. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["[a] reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"]; see also *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

The sustained petition alleged that "[t]he child [S.H.'s] mother . . . and father . . . have a history of engaging in violent altercations in the child's presence. . . . The father failed to protect the child in that the father allowed the mother to reside in the child's home and have unlimited access to the child." Exposure to domestic violence has been held to support jurisdiction under both section 300, subdivisions (a) and (b). (See *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-599 [jurisdiction proper under subd. (a)]; *In re E.B.* (2010) 184 Cal.App.4th 568, 574-575 [jurisdiction proper under subd. (b)]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 168 [jurisdiction proper under subd. (b)].)

It is undisputed that mother violently attacked father on multiple occasions, and at times when father was holding S.H. Moreover, father had endured years of abuse from mother without making any effort to protect himself, or S.H. The only reason the Department became involved was because the hospital made a report of suspected child abuse due to mother's violent and irrational behavior. Although father initially cooperated with the Department, it was clear that mother was still a threat, as she repeatedly broke into the family home (once to obtain a gun to purportedly kill father), and even attempted to abduct S.H. As the dependency proceedings carried on, father became uncooperative and would not allow the Department to have access to S.H. to assess his safety. He also continued to romanticize his relationship with mother, notwithstanding the fact that it was pervaded with domestic violence and instability from

14

the beginning.  These facts are substantial evidence of a serious and continuing threat to S.H.'s safety.[3]

Mother contends this case is like *In re A.G.* (2013) 220 Cal.App.4th 675, where the court found that jurisdiction, based solely on the mother's mental illness, was not warranted where the father was able to protect the children from mother by caring for the children and providing a nanny.  (*Id*. at pp. 686-687.)  This case is nothing like *In re A.G.* Here, jurisdiction was based not only on mother's mental illness, but also on her substance abuse and domestic violence, as well as father's failure to protect S.H.  And, in any event, having found that the family's domestic violence supports jurisdiction, we need not address mother's argument that her mental health (or her substance abuse) did not support jurisdiction.  (*In re Jonathan B*., *supra*, 5 Cal.App.4th at p. 875.)

**DISPOSITION**

The orders are affirmed.


GRIMES, J.

We concur:

BIGELOW, P. J.


RUBIN, J.

---

[3]    Father has not appealed.  We have no occasion to address father's conduct except to the extent he may not have been in a position to protect S.H. because father was a victim of domestic abuse and faced additional threats from mother when he tried to protect S.H.